IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VINCENT BROWN, <u>et al.</u> | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 03-1303 (JBS) |
| v. | |
| CITY OF CAMDEN, <u>et al.</u> | **<u>OPINION</u>** |
| Defendants. | |

APPEARANCES:

Alan E. Denenberg, Esq.
ABRAMSON & DENENBERG, PC
6 East Miami Avenue
Cherry Hill, NJ 08034
    Attorney for Plaintiffs

Lewis Wilson
City Attorney for the City of Camden
By:  Felix Gonzalez
     Assistant City Attorney
OFFICE OF CITY ATTORNEY
4th Floor – City Hall
520 Market Street
P.O. Box 95120
Camden, NJ 08101
    Attorney for Defendants

**SIMANDLE**, District Judge:

This case stems from a traffic stop turned "felony stop" of a vehicle containing a couple on their way to drop off their two young daughters at school.  Plaintiffs filed this suit for damages under 42 U.S.C. § 1983 alleging violations of their Fourth Amendment rights.  The matter is before the Court upon Defendants' motion for summary judgment.  For reasons expressed below, the Court finds that material factual issues exist

precluding the entry of summary judgment as to Defendants George Carlin, Buddy Camp and Vincent McCalla.  Accordingly, Defendants' motion will be denied as to those Defendants.  The Court will grant summary judgment, however, in favor of Defendants City of Camden and Robert Allenbach.

## I.   BACKGROUND

On March 26, 2001, at 7:30 A.M., Plaintiff Vincent Brown was driving in Camden with his wife, Laura Brown, and their eleven and twelve year old daughters, Alexis and Aleilya, when they were pulled over by Officers Vincent McCalla and Buddy Camp of the Camden Police Department.  It was snowing that morning, so Plaintiff had the vehicle's windshield wipers turned on.  According to the Officers, though, the vehicles headlights were turned off in violation of New Jersey motor vehicle law.[1]  Therefore, according to the officers, they decided to pull over Plaintiffs' car.  (Camp Dep. Tr. at 29:6-8.)

The vehicle being driven by Plaintiff was a blue Chevy Tahoe with temporary license plates, tinted rear windows, and standard hubcaps.  (Pls. Ex. E.)  The officers claim that Plaintiffs' vehicle matched the description of a car belonging to a murder suspect, Bernard Murray.  In fact, according to Defendants, just that morning at the daily role call Sergeant Carlin had given

---

[1] As noted below, New Jersey law prohibits operating a motor vehicle without headlights when the windshield wipers are activated.

2

them the description of Murray's car, a "dark-colored," possibly dark blue or black, four dour Chevy Tahoe.[2]  (Carlin Dep. Tr. at 21:2-8; Camp Dep. Tr. at 37:9-23.)  According to McCalla, Carlin also informed the officers that the vehicle carrying Murray had "rims."[3]  Finally, the officers claim that they were told that Murray frequented the East/North Camden area.  (Camp Dep. Tr. at 40:13-16.)

Based on the above, the officers followed the Brown's SUV one of them contacted Sergeant Carlin by radio to relay the vehicle's description.  Carlin agreed that the description of Plaintiffs' vehicle matched the one possibly containing Murray. Accordingly, Carlin advised the officers to pull the car over. Officers Camp and McCalla then proceeded to activate their police van's overhead lights, signaling to Plaintiff to pull over to the side of the road, which Plaintiff did.  According to Plaintiffs, Officer McCalla then approached the driver's side of the vehicle as Officer Camp approached the passenger side, both with guns drawn.  (Mr. Brown Dep. Tr. at 31:15-17.)  Defendants dispute

---

[2] Sergeant Carlin claims that he received the information from another police officer.  (Carlin Dep. Tr. at 66:15-23.)  The original source of the information was Detective Wysocki who had relayed it to the City of Camden Police "District House" on or about March 17, 2001, roughly one week after Murray was allegedly involved in another homicide.  (Wysocki Dep. Tr. at 25:15-20.)

[3] Most new cars come standard with either hubcaps.  For aesthetic reasons, some car owners replace hubcaps with highly polished wheels which are plated with a chrome mirror finish, which are commonly referred to as "rims."

that their guns were drawn when they first approached the
vehicle.

Once to the driver's side, Officer McCalla asked Mr. Brown
for his drivers license and insurance information.  (Id. at
30:11-14.)  At the same time, Camp approached Mrs. Brown's side
of the vehicle with his weapon pointed at her.  Plaintiffs
maintain that Mrs. Brown then rolled down her window and pleaded
for the officer to put to down the gun as there were children in
the car.  (Id. at 31:10-14; Mrs. Brown Dep. Tr. at 91:18-20.)
The officers maintain that they were unable to confirm the number
or description of the passengers in the back seat as the rear
windows were heavily tinted and the sky was overcast.

After obtaining Plaintiff's documentation the officers
returned to their police van.  Camp and McCalla contend that
while in their vehicle they again radioed Sergeant Carlin, who
then advised them to conduct a "felony stop."  (Camp Dep. Tr. at
52:15-25; McCalla Dep. Tr. at 53:9-17; 56:22-57:6.)   Meanwhile,
Sergeant Carlin had proceeded to the area where the Browns were
stopped.  By that time, according to Carlin, at least a half
dozen other police vehicles had arrived to the scene.  (Carlin
Tr. at 33:12-21; 35:5-10.)  As Carlin was arriving, Officers Camp
and McCalla had begun to effectuate the "felony stop."  According
to Plaintiffs, the officers first ordered Mr. Brown from the
vehicle over a loudspeaker from the van.  (Mrs. Brown Dep. Tr. at

4

99:23-100-4; Mr. Brown Dep. Tr. at 38:8-11.)  Plaintiff was then ordered to throw the car keys on the ground and walk backwards towards the patrol wagon with his hands behind his head.  (Id.) According to Mr. Brown, a gun was held to his head as we was handcuffed and then placed in the back of the wagon.  The same procedure was then followed for Mrs. Brown.

Plaintiffs claim that after the couple was secured in the back of the wagon, Officer McCalla approached the Tahoe with his gun drawn, opened the car door, and saw the two young girls in the back seat.  Defendants maintain that as Mrs. Brown reached the back of the patrol van, she was identified by one of the officers on the scene.  According to the officers she then, for the first time, informed them that her children were in the car. (Camp Dep. Tr. at 62:13-23.)  The officers then confirmed that the children were in the back seat, and then Mr. and Mrs. Brown were released from custody.  (Mr. Brown Dep. Tr. at 46:2-48:4; Aleilya Brown Dep. Tr. at 141:23-143:7; Alexis Brown Dep. Tr. at 154:24-156:3.)

At 7:57 A.M., the officers issued a summons to Plaintiff for failing to turn on the headlights while operating the windshield wipers in violation of N.J.S.A. 39:3-47(a).[4]  (Def. Ex. F.)

---

[4] N.J.S.A. 39:3-47(a) provides in pertinent part:

No person shall drive, move, park or be in custody of
any vehicle or combination of vehicles on any street or
highway during the times when lighted lamps are

Eventually, Plaintiffs maintain, the ticket was dismissed by the Camden Municipal Court because the court concluded that Plaintiffs' vehicle was equipped with properly functioning daytime running lights on March 26, 2001.  (<u>See</u> Mrs. Brown Dep. Tr. at 54:3-9; Pls. Ex. E.)

Plaintiffs filed this Complaint on March 25, 2003 under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments.  In Counts I and II Plaintiff allege illegal seizure and excessive force claims against Defendants Camp, McCalla and Carlin.  In Count III Plaintiffs claim that Defendants City of Camden and Robert Allenbach, Chief of Police, should be held liable under Section 1983 for failure to properly train, supervise and discipline officers, and for implementing an

---

required unless such vehicle or combination of vehicles displays lighted lamps and illuminating devices as hereinafter in this article required.

Additionally, N.J.S.A. 39:3-46 defines "When lighted lamps are required" as:

any time from a half-hour after sunset to a half-hour before sunrise; whenever rain, mist, snow or other precipitation or atmospheric moisture requires the use of windshield wipers by motorists; and during any time when, due to smoke, fog, unfavorable atmospheric conditions or for any other cause there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of 500 feet ahead.

unconstitutional policy of racial profiling and excessive force.[5]
Defendants subsequently filed this motion for summary judgment
pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable
inferences are to be drawn in [that party's] favor.'"  Hunt v.
Cromartie, 526 U.S. 541, 552 (1999) (quoting  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is
whether there are "any genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably
be resolved in favor of either party."[6]  Liberty Lobby, 477 U.S.

---

[5] Plaintiffs also seek in Count IV to hold certain unnamed
defendants liable under a theory of bystander liability.  "The
case law is clear that fictitious parties must eventually be
dismissed, if discovery yields no identities . . . ."  Hindes v.
Federal Deposit Ins. Corp., 137 F.3d 148, 155 (3d Cir. 1998)
(quotations and citations omitted).  Accordingly summary judgment
will be entered as to the unnamed parties in Count IV.

[6] The moving party always bears the initial burden of
showing that no genuine issue of material fact exists, regardless
of which party ultimately would have the burden of persuasion at

at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

## III. DISCUSSION

   A.   Initial Traffic Stop

   Plaintiff first challenge the initial traffic stop under the Fourth Amendment.

   "An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). "[E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." Delaware v. Prouse, 440 U.S. 648, 663 (1979). For the following reasons, the Court finds that there are questions of fact as to the legitimacy of the initial traffic stop in this case which preclude the grant of summary judgment in

_____

trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056, 1061-63 (3d Cir. 1991).

Defendants' favor.

Here, the Defendant officers testified that the decision to conduct the traffic stop was initially made because Plaintiffs were operating their vehicle without headlights in violation of New Jersey law.  Plaintiffs have submitted proofs, however, from which a reasonable jury could conclude that the vehicle was equipped with daytime running headlights which were operating properly on the date in question:  (1) the Browns testified that the headlights were turned on when they were stopped on March 26th; (2) the summons issued by the officers was dismissed after the Municipal Court concluded that the vehicle was equipped with properly functioning daytime running lights on the date in question; and (3) a vehicle inspection conducted on April 18, 2001 states that the daytime running lights on Plaintiffs' vehicle worked properly.  (See Mrs. Brown Dep. Tr. at 54:3-9; Pls. Ex. E.)  Accordingly, the Court finds that there are questions of fact regarding whether the officers had cause to believe a traffic violation occurred which justified the traffic stop.

Moreover, to the extent Defendants argue that the stop was valid because the officers believed that one of the vehicle's occupants had otherwise violated the law, see Prouse, 440 U.S. at 663, the Court finds that questions of fact exist as to that issue as well.  Specifically, the Court holds that a reasonable

9

jury could determine that the officers did not have articulable and reasonable suspicion that a murder suspect was in the vehicle when they pulled it over.

Importantly, at the time of the stop Officers McCalla and Camp possessed only limited information regarding Bernard Murray and the car that could have been carrying him.  First, the officers claim that they were told by Sergeant Carlin at that morning's roll call that Murray was traveling in a dark colored, possibly blue or black, Chevy Tahoe.  Other than that vague description, though, the officers were told nothing other than that Murray frequented the East/North Camden area.  Based on this information alone, Defendants would have this Court find as a matter of law that the officers had reasonable suspicion to believe that Murray was traveling in the Browns' vehicle on March 26th.  The Court holds that a reasonable jury could hold otherwise.

First, the officers claim that they were not able to identify the passengers in the vehicle.  Indeed, officer McCalla admits he could not even ascertain the race or gender of any of the car's occupants once they began their pursuit.  (McCalla Dep. Tr. at 41:22-43:13.)  Notwithstanding that belief, though, the officers did not have their guns drawn as they approached the vehicle for the first time.  A reasonable jury could conclude that if the officers actually believed the vehicle was carrying a

10

murder suspect, the officers would have conducted a felony stop immediately, which they did not.

Finally, while the officers were able to identify that the vehicle had temporary tags, they were given no indication by Sergeant Carlin, either at roll call or over a radio transmission, that the Tahoe possibly carrying Murray had such tags. For these reasons, the Court finds that a reasonable jury could determine that the officers did not possess articulable and reasonable suspicion that a wanted felon was in the Browns' car when they pulled it over.

Plaintiffs also seek to hold Sergeant Carlin liable for his involvement in the initial traffic stop. Obviously, Carlin can be held liable if he either participated in or approved the actions of the officers involved in the allegedly unconstitutional stop. See C.H. v. Olivia, 226 F.3d 198, 201 (3d Cir. 2000) (en banc) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Township, 50 F.3d 1186, 1190 (3d Cir. 1995)).

Here, Defendants admit that Carlin explicitly advised the officers to pull over Plaintiffs' vehicle because the vehicle matched the description of a vehicle possibly containing a murder suspect. For the same reasons just explained, a reasonably jury could find that the information possessed by Carlin and the officers did not amount to reasonable and articulable suspicion.

11

Therefore, the Court will likewise deny Carlin's motion for summary judgment as to the claim arising from the initial traffic stop.

### B.   Excessive Force

Plaintiffs next claim that after they were pulled over the officers used excessive force by conducting a "felony stop." Defendants seek summary judgment as to this claim as well.  The Court will deny Defendants' motion for the following reasons.

The Fourth Amendment prohibits the use of excessive force by a law enforcement officer.  U.S. Const. amend XIV.  See Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).  "The test is an objective one, which scrutinizes the reasonableness of the challenged conduct. . . .  Reasonableness is to be evaluated from the 'perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Carswell, 381 F.3d at 240 (quoting Graham, 490 U.S. at 396 (internal citations omitted)).

According to the Supreme Court, deadly force is reasonable when "it is necessary to prevent the escape [of a suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  Tennessee v. Garner, 471 U.S. 1, 3 (1985). The Third Circuit, drawing on Garner and Graham, set forth the

12

following standard for analyzing whether the use of deadly force
is reasonable under the Fourth Amendment:

> Giving due regard to the pressures faced by the police,
> was it objectively reasonable for the officer to
> believe, in light of the totality of the circumstances,
> that deadly force was necessary to prevent the
> suspect's escape, and that the suspect posed a
> significant threat of death or serious physical injury
> to the officer or others? . . .  The factors to
> consider include the "severity of the crime at issue,
> whether the suspect poses an immediate threat to the
> safety of the officer or others, and whether he is
> actively resisting arrest or attempting to evade arrest
> by flight."

Abraham v. Raso, 183 F.3d 279, 288-96 (1999) (citing Graham, 490
U.S. at 396).

"Pointing a loaded gun at another person is a display of
deadly force because it creates more than a remote possibility of
death."  Schall v. Vazquez, 322 F. Supp. 2d 594, 600 (E.D.Pa.
2004) (citing Model Penal Code § 3.11(2) (1994) (defining "deadly
force" as "force which the actor uses with the purpose of causing
or which he knows to create a substantial risk of causing death
or serious bodily harm.") (cited in Africa v. City of
Philadelphia, 49 F.3d 945 (3d Cir. 1995) and Matthews v. Jones,
35 F.3d 1046, 1050-51 (6th Cir. 1994))).  In other words,  an
officer's actions need not actually wound or kill a person to be
considered a display of deadly force for Fourth Amendment
purposes.  Schall, 322 F. Supp. 2d at 600 (citing Ryder v. City
of Topeka, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987)).

Plaintiffs here claim that the officers used excessive force

13

by drawing their guns and handcuffing Mr. and Mrs. Brown.  They argue that the officers could not have reasonably believed that the Tahoe was carrying among its passengers a dangerous individual and, thus, the display of deadly force was unnecessary.[7]  For the following reasons, the Court holds that a reasonable jury could agree.

It is undisputed that the officers conducting the felony stop possessed information that a dangerous individual named Bernard Murray could possibly be in the area where Plaintiffs were traveling on March 26, 2001.  The issue here is therefore whether the officers could have reasonably believed that Murray would be traveling in Plaintiffs' car.[8]  In light of the holding above that a reasonable jury could find that the officers did not have articulable suspicion that Murray was among the car's passengers when they conducted the initial stop, the Court need only examine what additional facts, if any, the officers obtained once the stop was made.

First, as discussed above, Defendants maintain that prior to the initial stop they believed that the Browns could be carrying

---

[7] In other words, Plaintiffs' challenge focus on _that_ a felony stop was conducted, not _how_ it was actually conducted.

[8] Stated differently, even if the jury concludes at trial that the officers had a reasonable and articulable suspicion that Murray was in the vehicle, thereby warranting the initial traffic stop, the same jury could conclude that excessive force was used once the stop was made.

Murray.  Nonetheless, according to the Defendants, when the officers initially approached the vehicle their guns were not drawn.  Instead, they approached both sides of the vehicle and Officer McCalla asked Mr. Brown for his identification. Moreover, according to Plaintiffs' version of the events, Mrs. Brown told the officers that her two young daughters were seated in the rear of the car.  Finally, it is undisputed that Plaintiffs complied with all of the officers' commands.

Based on the foregoing, a jury could reasonably conclude that if the officers did not feel that the situation warranted a felony stop initially, their further observations did nothing to create the appearance of a heightened danger.[9]  Indeed, after the officers returned to their vehicle the officers did not even attempt to run a criminal history of Mr. Brown.  (McCalla Dep. Tr. at 57:16-58:3.)  Accordingly, a jury could conclude that following the initial stop the officers could not have reasonably believed that heightened measures were necessary and, thus, that they used excessive force by drawing their guns and placing Mr. and Mrs. Brown in custody.  For these reasons, the Court will

---

[9] To be sure, McCalla did testify that Mr. Brown appeared agitated and evasive.  Moreover, the officers maintain that they were unable to confirm the number or description of the passengers in the rear seat as the rear windows were heavily tinted and the sky was overcast.  However, these are questions of fact which are properly left to a jury to decide, especially in light of Plaintiffs' testimony that Mrs. Brown told the officers that her children were the passengers in the back seat.

deny Defendants' motion as to Plaintiffs' Fourth Amendment excessive force claim.

C.   Qualified Immunity

Defendants argue that even if they are found to have violated Plaintiffs' Fourth Amendment rights, they are entitled to qualified immunity.  For the following reasons, the Court finds that Defendants Carlin, Camp and McCalla are not shielded by qualified immunity under the circumstances presented here.

The qualified immunity inquiry requires the Court to evaluate in the first instance whether, taken in the light most favorable to Plaintiffs, the facts alleged demonstrate that the officers' conduct violated a constitutional right.  "This must be the initial inquiry."  Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)); Williams v. Bitner, ___ F.3d ___, 2006 U.S. App. LEXIS 18583, at *10-13 (3d Cir. July 25, 2006).  If the threshold question is answered in the affirmative, the court must then examine whether the officers' alleged conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  See Hope v. Pelzer, 536 U.S. 730, 739 (2002); Wilson v. Layne, 526 U.S. 603, 609 (1999); Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004) (citing Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997)).

16

Here, the Court holds at the outset that in the light most favorable to Plaintiffs, the facts alleged demonstrate violations of the constitutional rights to be free of unlawful seizure and arrest and to be free from the use of excessive force in making the arrest.  In other words, the alleged conduct, if proved, violated Plaintiffs' constitutional rights.  The Court finds that under Plaintiffs' version of the facts, no reasonable police officer would have believed that there were a sufficient basis for stopping Plaintiffs' vehicle, removing Plaintiffs at gunpoint, handcuffing them, and taking them into custody merely for driving a dark Chevy Tahoe in Camden.

In light of the foregoing, the Court will turn its attention to whether the constitutional rights alleged to have been violated were clearly established at the time of the arrests. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Carswell, 381 F.3d at 242 (quoting Pelzer, 536 U.S. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))).  In other words, the court must "survey . . . the circumstances known to the" officers at the time of the challenged conduct and determine "whether, in the circumstances here, it would have been clear to a reasonable officer that [the defendant's] conduct was unlawful in the situation he confronted."  Carswell, 381 F.3d at

243.

In this case, for the reasons already discussed, the Court finds that a reasonable officer would have understood that it was clearly unlawful to pull Plaintiffs' vehicle over, and then conduct a felony stop involving the display of deadly force, where the officers did not possess even articulable suspicion that the occupants of the car had committed a traffic violation or otherwise violated the law.

Because the Court holds that "the wrongfulness of the officer[s'] conduct would have been clear," the Court must next "determine whether [the officers] made a reasonable mistake" as to what the law requires.  Id.  This inquiry's purpose "is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . .  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense."  Id. at 242 (quoting Saucier, 533 U.S. at 205).  "A survey of the circumstances known to [the officers] is necessary to properly apply this test."  Carswell, 381 F.3d at 243.  In this Circuit, the Court must make the ultimate determination on the availability of qualified immunity as a matter of law.  Carswell, id., citing Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002); Sharrar, 128 F.3d at 828.

Here, as already discussed at length, the officers possessed

very limited information regarding the alleged murder suspect or the vehicle that could possibly have been carrying him.[10] Moreover, none of the officers' observations during the initial stop could have led a reasonable officer to believe that arresting Mr. and Mrs. Brown at gunpoint and placing them in custody was a legally justified course of action.  It is not a "reasonable mistake" to believe it is constitutionally permissible to stop and arrest the occupants of any dark colored Chevy Tahoe merely because a suspect was reportedly operating a dark Chevy Tahoe on a prior day in the same half of this large city.  There is no basis to conclude that it was merely a mistaken coincidence that these innocent motorists happened to be driving a suspicious vehicle in the wrong place at the wrong time, when in fact these defendants had no information that made it probable that the murder suspect might be in this vehicle. Such vehicles are not unusual, nor did this vehicle have the only distinctive feature of the suspect vehicle, which was custom hubcaps.  Where the vehicle description is so generic and stale, and where the vehicle and underlying circumstances do not

---

[10] Moreover, based on Plaintiffs' version of the facts, which is substantiated by other evidence in the record, no reasonable officer Plaintiffs could have believed that Plaintiffs had committed a traffic violation warranting the initial stop.  The alleged traffic offense of failure to use lights while the windshield wipers were operating appears to be mechanically impossible for the Browns' vehicle, which employs full-time running lights and thus had to have been properly illuminated when the car was operating, as discussed above.

19

essentially match what the police are seeking, a reasonable patrol officer could not suspect that the wanted individual was in this particular vehicle, under Plaintiffs' version of the facts.

Unlike the officer in Carswell, the officers here should have known that their actions were improper in light of the circumstances presented.  In short, there was simply nothing suspicious about Plaintiffs' conduct, and Defendants have not pointed to any legal authority that might cloud the issue.[11]  See Couden v. Duffy, 446 F.3d 483, 495-96 (3d Cir. 2006) (holding officers not entitled to qualified immunity where it would have been clear to a reasonable officer that the conduct observed by the defendant officers did not provide the reasonable suspicion of illicit activity necessary to conduct a warrantless seizure of a mother and her children in their car).  For these reasons, the Court holds as a matter of law that Defendants Carlin, Camp and McCalla are not entitled to qualified immunity.

D.   Municipal Liability

Next, the Court finds that summary judgment should be entered as to Defendants City of Camden on Plaintiffs' claim under Section 1983 alleging racial profiling and a policy of

---

[11] The Third Circuit has upheld qualified immunity in cases "where there is 'at least some significant authority' that lends support of the police action . . . ." Id. (quoting Doe v. Groody, 361 F.3d 232, 243 (3d Cir. 2004)); Bitner, 2006 U.S. App. LEXIS 18583.

unconstitutional excessive force.[12]

As a general matter, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 694 (1978).  In other words, a municipality can only be held liable under Section 1983 when the municipality has officially sanctioned or ordered the final decision.  City of St. Louis v. Prapotnik, 485 U.S. 112 (1987).

Another variation of § 1983 liability exists when a municipality fails to train, instruct, counsel, supervise and discipline officers.  City of Canton v. Harris, 489 U.S. 378, 387 489 U.S. at 387 (finding municipal liability under § 1983 where supervisors failed to properly train employees and this failure resulted in the unconstitutional deprivation of rights).  This

_____

[12] Defendants additionally argue that the Court should grant summary judgment in favor of the Camden Police Department.  While it is well-established that in a section 1983 cause of action, police departments can not be sued in conjunction with municipalities because police departments are merely administrative arms of the local municipality and not separate judicial entities, Linden v. Spagnola, No. 99-2432, 2002 U.S. Dist. LEXIS 14573, at *17-18 (D.N.J. June 27, 2002); DeBillis v. Kulp, 266 F. Supp. 2d 255, 264 (E.D.Pa. 2001), Plaintiffs here have not named the Camden Police Department as a defendant.

21

type of liability, referred to as "failure to train," is reserved only for those instances where the municipality acted with "deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388.

"Findings of deliberate indifference, as a matter of law, require that there be a history of unconstitutional behavior by municipal employees. The Supreme Court has found that municipal liability for failure to train under § 1983 cannot be inferred from a single instance of police misconduct by a non-policy making employee." Labo v. Borger, 2005 U.S. Dist. LEXIS 17176, at *14 (D.N.J. Aug. 15, 2005) (citing City of Oklahoma v. Tuttle, 471 U.S. 808, 813 (1985); City of Canton, 489 U.S. at 397 (a jury cannot infer "deliberate indifference" on the part of the trainer or supervisor from a single incident of police misconduct).

Plaintiffs here have not presented any evidence of an official policy or practice of racial profiling or excessive force by the City of Camden or its officers. Instead, in support of their claim for municipal liability Plaintiffs point to Carlin's decision to order McCalla and Camp to stop Plaintiffs' vehicle. Plaintiffs' entire argument in favor of municipal liability ignores that municipal liability under § 1983 cannot be inferred from a single instance of police misconduct by a non-policy making employee. Borger, 2005 U.S. Dist. LEXIS 17176, at *14 (citing Tuttle, 471 U.S. at 813). Accordingly,

Plaintiffs' claim against the City of Camden and Chief Robert Allenbach fails as a matter of law.[13]

**IV.   CONCLUSION**

    For the reasons stated, the Court will deny summary judgment as to the claims against Defendants Camp, McCalla and Carlin, and grant summary judgment as to Defendants City of Camden and Robert Allenbach.

    An appropriate Order will be entered.

**July 27, 2006**          **s/ Jerome B. Simandle**
Date                  JEROME B. SIMANDLE
                      U.S. District Judge

---

[13] Additionally, as to the claim against Chief Allenbach the Court notes that a state official may be held responsible under § 1983 for failing to exercise supervisory authority if that official "has exhibited deliberate indifference to the plight of the person deprived." See Sample v. Dieks, 885 F.2d 1099, 1118 (3d Cir. 1989). Here, Plaintiffs have not alleged either (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, or (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval. See Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997) (quoting Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d Cir. 1988)). For this reason as well, summary judgment as to Defendant Allenbach is appropriate.